Steven **KARP**, by his guardian ad litem Marvin Karp, **Plaintiff-Appellant**,

v.

**Elliott BECKEN et al., Defendants-Appellees.**

**No. 25161.**

United States Court of Appeals, Ninth Circuit.

April 5, 1973.

Rehearing Denied May 4, 1973.

S. Leonard Scheff (argued), Erik M. O'Dowd, Marvin D. Karp, Schorr & Karp, Tucson, Ariz., for plaintiff-appellant.

Clague A. Van Slyke (argued), Frank L. Ross, Bilby, Thompson, Schoenhair & Warnock, Lawrence Ollason, Special Deputy County Atty., Pima County, Rose S. Silver, Atty., Pima County, Tucson, Ariz., for defendants-appellees.

Before KOELSCH, HUFSTEDLER, and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

Appellant brought this action in the District Court pursuant to the Civil Rights Act (42 U.S.C. § 1983) for alleged violation of his First Amendment rights. The action was brought against school officials (appellees) who suspended appellant for five days from Canyon del Oro High School in Pima County, Arizona. Appellant sought to enjoin the school officials permanently from enforcing the suspension order. After a trial, the District Court entered findings of fact and conclusions of law in favor of the school officials.

Several students, including appellant, planned a chant and "walkout" at an athletic awards ceremony which was to be held at the high school in order to protest the refusal of the school to renew the teaching contract of an English instructor. Appellant gave notice of the plans to the news media the day before it was to occur, apparently resulting in an article about the planned walkout in the morning paper on the day of the assembly.

Before the ceremony began, the school officials were told by student body officers that if a "walkout" did take place, certain members of the Lettermen Club (the school athletes) would likely attempt to prevent it. Fearing a possibly violent confrontation, the school officials cancelled the assembly. Notwithstanding the cancellation, some students did stage a "walkout" from classes.

As part of his efforts to publicize a demonstration to be held later in the morning, appellant again notified the news media. During the lunch hour, students and newsmen gathered in the area of the school's multi-purpose room. At one point, appellant, who had been at this gathering, went out to his car in the parking lot and brought back signs supporting the English instructor and distributed them to other students.

The Vice-Principal ordered the students to surrender their signs, claiming they were not permitted to have them. There was no specific rule prohibiting the bringing of signs on campus.[1] All signs were surrendered immediately except those held by appellant. He asserted a Constitutional right to have and distribute the signs. When asked a second time, appellant gave up the signs and then accompanied the Vice-Principal into the administrative office, upon the latter's request. While appellant was in the administrative office, students began chanting, and pushing and shoving developed between the demonstrators and some Lettermen. Shortly after intervention by school officials, the demonstration broke up.

1. The absence of a specific regulation prohibiting signs is not a constitutional flaw. *See* Richards v. Thurston, 424 F.2d 1281, 1282 (1st Cir. 1970).

A couple of days later, after consultation with appellant's parents (who were out of town at the time of the activities noted), school officials advised appellant he was to be suspended for five days. School officials then offered to reduce the suspension to three days if appellant would agree to refrain from bringing similar signs on the campus. Appellant and his father refused to make such an agreement.

The difficulties inherent in federal court supervision of disciplinary problems in the 23,390 public school systems of this country were anticipated by Justice Black in his dissent in Tinker v. Des Moines School District, 393 U.S. 503, 515, 89 S.Ct. 733, 21 L.Ed.2d 731 (1962).[2] The reason for his concern is amply demonstrated in this case, which presents a conflict between asserted Constitutional rights and good-faith actions by school officials.

■ *Tinker*, of course, provides the standards. It is clear that public high-school students have a right to freedom of speech which is not shed at the schoolhouse gates. 393 U.S. at 506, 511, 89 S. Ct. 733. However, it is equally clear that the daily administration of public education is committed to school officials. Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). That responsibility carries with it the inherent authority to prescribe and control conduct in the schools. When a conflict does arise, *Tinker* then provides that the students' rights to free speech may not be abridged in the absence of "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities . . . ." 393 U.S. at 514, 89 S.Ct. at 740. Thus, the courts have recognized that the interest of a state in the maintenance of its educational system is a compelling one, provoking a balanc-

ing of First Amendment rights with a state's efforts to preserve and protect its educational process. Bayless v. Martine, 430 F.2d 873, 877 (5th Cir. 1970); Burnside v. Byars, 363 F.2d 744, 748 (5th Cir. 1966).

■ The *Tinker* rule is simply stated; application, however, is more difficult. Years ago, in a free speech case, Chief Justice Vinson noted "that neither Justice Holmes nor Justice Brandeis ever envisioned that a shorthand phrase should be crystallized into a rigid rule to be applied inflexibly without regard to the circumstances of each case." Dennis v. United States, 341 U.S. 494, 508, 71 S.Ct. 857, 866, 95 L.Ed. 1137 (1951). The shorthand phrase referred to in *Dennis* was "clear and present danger," but the remarks are equally appropriate to "substantial disruption or material interference"; federal courts should treat the *Tinker* rule as a flexible one dependent upon the totality of relevant facts in each case. See Grayned v. City of Rockford, 408 U.S. 104, 119, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The difficulty of application is even more pronounced because disruptive conduct was absent in *Tinker*; there were "no disturbances or disorders on the school premises . . . ." 393 U.S. at 514, 89 S.Ct. at 740. The *Tinker* court borrowed the phraseology of the rule from the Fifth Circuit decision in Burnside v. Byars, *supra*; but there too, disruption or interference was absent, there being only a "mild curiosity." 363 F.2d at 748. Consequently, the two cases which provided the rule give little assistance in its application to specific facts. However, the Fifth Circuit panel which decided *Burnside* also decided Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966). In *Blackwell*, they found more than a "mild curiosity"; in fact, "there was an unusual degree of commotion, boisterous

2. *See also* Karr v. Schmidt, 401 U.S. 1201, 91 S.Ct. 592, 27 L.Ed.2d 797 (Black, Circuit Justice, 1971). As of the decision in Karr v. Schmidt, 460 F.2d 609 (5th Cir.) (en banc), cert. denied, 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972), the federal circuit courts had invested the time necessary to decide at least twenty-two cases involving the length of student hair.

conduct, a collision with the rights of others, an undermining of authority, and a lack of order, discipline and decorum." 363 F.2d at 754. Evidently, such conduct resulted in substantial disruption, for the court upheld a regulation banning the wearing of buttons though the regulation was similar to the one struck down in *Burnside*.

 Thus, mild curiosity alone will not justify abridgement though Blackwellian disorder and disruption will. The question presented by the present case is whether incidents falling between the two extremes might also permit the imposition of restraints. For three reasons, we believe so. First, the First Amendment does not require school officials to wait until disruption actually occurs before they may act.[3] In fact, they have a duty to prevent the occurrence of disturbances. Second, *Tinker* does not demand a certainty that disruption will occur, but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption. 393 U.S. at 514, 89 S.Ct. 733. And finally, because of the state's interest in education, the level of disturbance required to justify official intervention is relatively lower in a public school than it might be on a street corner.

 It should also be obvious that the actions of one claiming free speech abridgement on a school campus cannot be dissected from reality and observed in a vacuum. The same false cry of "fire" may be permissible in an empty theater, but certainly not when there is a capacity crowd. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.). The striking of a match may have no effect in an open field, but be lethal in a closed room filled with gases. Similarly, in making a determination in this case, in addition to consideration of the acts of appellant, all other circumstances confronting the school administrators which might reasonably portend disruption must be evaluated.

 The court in *Tinker* emphasized that there was no evidence documenting the school officials' forecast of disruption of the educational processes. 393 U.S. at 508–509, 514, 89 S.Ct. 733.[4] In contrast, the record here reflects the following facts, justifying a reasonable forecast of material interference with the school's work:

1. On the morning involved, there was a newspaper article relating to the planned assembly walkout. The article indicated that the newspaper's source of information was a reporter's conversation with appellant.

2. The highschool Principal and other school officials testified that the school athletes had threatened to stop the proposed demonstration.

3. The assembly was cancelled because school officials feared a walkout might provoke violence.

4. Later in the morning, newsmen appeared on the campus and set up their equipment. During this time, appellant and other students, during a free period, were milling around outside the building talking with these newsmen.

5. The Vice-Principal testified to his impression that there was a general atmosphere of excitement and expectation pervading the campus and classrooms. There was an intense feeling something was about to happen.

6. Some students actually walked out from class, notwithstanding the cancellation of the assembly.

7. About the time when the assembly walkout would have occurred, someone pulled the school fire alarm, which, had

---

3. *See* Butts v. Dallas Independent School Dist., 436 F.2d 728, 731 (5th Cir. 1971); Norton v. Discipline Comm. of E. Tenn. State Univ., 419 F.2d 195, 199 (6th Cir. 1969), cert. denied, 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562 (1970).

4. *See also* Butts v. Dallas Independent School Dist., 436 F.2d 728, 731 (5th Cir. 1971); Burnside v. Byars, 363 F.2d 744, 748 (5th Cir. 1966).

it not been previously disconnected by the Vice-Principal, would have emptied every room in the entire school.

8. Approximately fifty students gathered in the area of the multi-purpose room who talked among themselves and with news media personnel.

9. Excited by the situation, twenty to thirty of the junior high students who share facilities with the highschool and who were eating at the highschool cafeteria during their lunch period, interrupted their lunch and ran into the area of the multi-purpose room to watch the group of students and news people gathered there. The junior high students ran about the group excitedly and, as a result, their supervisors determined their lunch period should be shortened and they were returned to their classrooms earlier than usual.

10. Appellant went to the school parking lot and took the signs from his car to the area where the students had congregated near the multi-purpose room and proceeded to distribute them.

In view of these facts, the sole question is whether this evidence is substantial enough to support the school officials' forecast of a reasonable likelihood of substantial disruption. The temptation to be a "Monday morning quarterback" should be resisted—focus should be upon whether the apprehension of the school officials was unreasonable under the circumstances. The officials in *Tinker* anticipated a level of disruption which did not justify curtailment of free speech. The officials in this case testified, and the trier of fact apparently believed, that they feared the provocation of an incident, including possible violence, and that they took the signs from the appellant in an effort to prevent such an incident. Considering all the facts, we do not find that such an anticipation, or forecast, was unreasonable.

However, a determination that the school officials were justified in taking the signs from appellant (and thus curtailing his exercise of claimed First Amendment rights) does not terminate our inquiry. The second question is whether the school officials properly suspended him from school for five days. The district court found that the suspension resulted from "his activities in connection with the planned 'walkout', the demonstration, and, principally, because of his conduct in bringing the signs on campus and attempting to distribute them." That the primary reason for suspension was the sign activity is further demonstrated by the fact that the school officials would have shortened the suspension to three days if he had agreed to refrain from bringing similar signs onto the campus.

The sign activity in this case constituted the exercise of pure speech rather than conduct. Cohen v. California, 403 U.S. 15, 18–19, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Tinker, supra,* 393 U.S. at 508, 89 S.Ct. 733. As such, it comes within the protective umbrella of the First Amendment. We have already held that school officials may curtail the exercise of First Amendment rights when they can reasonably forecast material interference or substantial disruption. However, for discipline resulting from the use of pure speech to pass muster under the First Amendment, the school officials have the burden to show justification for their action. Here they failed to do so. Absent justification, such as a violation of a statute or school rule, they cannot discipline a student for exercising those rights. The balancing necessary to enable school officials to maintain discipline and order allows curtailment but not necessarily punishment. Consequently, appellant could not be suspended for his activities with the signs. We need not reach the question of whether the remaining two of the three reasons for the suspension were constitutionally permissible. There is no way to determine, based upon this record, what part of the five days was solely for the sign activities. Therefore, we are left with no choice but to invalidate the entire suspension.

What we have said does not mean that the school officials could not have suspended appellant for violating an existing reasonable rule. In fact, in securing the signs, he broke a regulation by going to the parking lot during school hours. However, this was not a basis of the suspension. See Eisner v. Stamford Board of Education, 440 F.2d 803 (2d Cir. 1971). We have only held that, under the circumstances of this case, appellant could not be suspended on the sole basis of his exercising pure free speech when no justification was demonstrated.

Reversed and remanded for further proceedings consistent with this opinion.