257 F.3d 981 (9th Cir. 2001)
 BRUCE LAVINE, AS NEXT FRIEND OF JAMES LAVINE; JAMES LAVINE, PLAINTIFFS-APPELLEES,
v.
BLAINE SCHOOL DISTRICT, A MUNICIPAL CORPORATION; TIM HANEY; OPINION DAN NEWELL; KAREN MULHOLLAND, DEFENDANTS-APPELLANTS.
 No. 00-35303
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 4, 2000
July 20, 2001
 
 Tyna Ek, Merrick, Hofstedt & Lindsey, Seattle, Washington, for the defendants-appellants.
 Philip J. Buri, Breean L. Beggs, Brett & Daugert, Bellingham, Washington, for the plaintiffs-appellees.
 Appeal from the United States District Court Western District of Washington Barbara J. Rothstein, Chief Judge, Presiding D.C. No. CV-99-01074-BJR
 Before: Betty B. Fletcher and Raymond C. Fisher, Circuit Judges, and William W Schwarzer,* District Judge.
 Fisher, Circuit Judge.
 
 
 1
 This case has its genesis in a high school student's poem, which led to his temporary, emergency expulsion from school. It arises against a backdrop of tragic school shootings, occurring both before and after the events at issue here, and requires us to evaluate through a constitutional prism the actions school officials took to address what they perceived was the student's implied threat of violent harm to himself and others. Given the knowledge the shootings at Columbine, Thurston and Santee high schools, among others, have imparted about the potential for school violence (as rare as these incidents may be when taken in context), we must take care when evaluating a student's First Amendment right of free expression against school officials' need to provide a safe school environment not to overreact in favor of either. Schools must be safe, but they are educational institutions after all, and speech -including creative writing and poetry -is an essential part of the educational fabric. Although this is a close case in retrospect, we conclude that when the school officials expelled James LaVine they acted with sufficient justification and within constitutional limits, not to punish James for the content of his poem, but to avert perceived potential harm.
 
 FACTUAL AND PROCEDURAL BACKGROUND[1]
 
 2
 In the fall of 1998, James LaVine was in eleventh grade and a student in Vivian Bleecker's sixth period English class at Blaine High School. One evening in June or July 1998, James wrote the first draft of a poem he entitled"Last Words." The final version reads:
 
 
 3
 As each day passed, I watched, love sprout, from the most, unlikely places, wich reminds, me that, beauty is in the eye's, of the beholder.
 
 
 4
 As I remember, I start to cry, for I, had leared, this to late, and now, I must spend, each day, alone, alone for supper, alone at night, alone at death.
 
 
 5
 Death I feel, crawlling down, my neck at, every turn, and so, now I know, what I must do.
 
 
 6
 I pulled my gun, from its case, and began to load it.
 
 
 7
 I remember, thinking at least I won't, go alone, as I, jumpped in, the car, all I could think about, was I would not, go alone.
 
 
 8
 As I walked, through the, now empty halls, I could feel, my hart pounding.
 
 
 9
 As I approched, the classroom door, I drew my gun and, threw open the door, Bang, Bang, Bang-Bang.
 
 
 10
 When it all was over, 28 were, dead, and all I remember, was not felling, any remorce, for I felt, I was, clensing my soul,
 
 
 11
 I quickly, turned and ran, as the bell rang, all I could here, were screams, screams of friends, screams of co workers, and just plain, screams of shear horor, as the students, found their, slayen classmates,2 years have passed, and now I lay, 29 roses, down upon, these stairs, as now, I feel, I may, strike again.
 
 
 12
 No tears, shall be shead, in sarrow, for I am, alone, and now, I hope, I can feel, remorce, for what I did, without a shed, of tears, for no tear, shall fall, from your face, but from mine, as I try, to rest in peace, Bang!
 
 
 13
 Around that time, several school shootings had occurred --including the tragedy at Thurston High School in nearby Springfield, Oregon -and were frequent topics in the news.[2] The morning after James wrote the poem, he showed it to his mother. She warned James not to turn the poem in to his teachers at school, because "with everything that was on the news . . . whoever read it might overreact."
 
 
 14
 James forgot about the poem until he rediscovered it in his living room on September 30, 1998. He made some editorial changes and brought it to school on Friday, October 2. He showed the poem to several of his friends, some of whom liked it and some of whom did not. At that point, he decided to ask his English teacher, Ms. Bleecker, her opinion of "Last Words."
 
 
 15
 James had not been in school for the three days prior to October 2. At the end of his sixth period English class, he turned in several assignments and the poem. James asked Bleecker if she would read the poem and tell him what she thought. Bleecker thanked James for the poem and said she looked forward to reading it. The poem was not an assignment or an "extra credit" project, but James had turned in other poems to his previous English teachers at Blaine High School and appreciated their feedback.
 
 
 16
 That evening, Bleecker read "Last Words" and became concerned. Her impression of James up to that time was that he was a very quiet student. She thought the poem might be "James' way of letting somebody know that . . . maybe something's hurting him, maybe he's upset about something, maybe he's afraid." The next morning (Saturday), Bleecker contacted Karen Mulholland, James' school counselor, to discuss the contents of the poem. Mulholland was similarly concerned and set up a meeting that evening with Bleecker and Tim Haney, the school's vice principal.
 
 
 17
 During his time at Blaine High School, James had frequently confided in Mulholland, who is also a school psychologist. In 1996, James told her that he thought about suicide. Mulholland made James promise her that he would talk to her before he tried to kill himself. Thereafter, Mulholland kept an eye out for James and tried to make time to help him when he needed it. In fall 1998, James told her about several incidents that had occurred in his home. In particular, on September 12, James and his father had had an argument about James' car. James' father, Bruce, had thrown a rock in the direction of James and his car. James called the police, who filed charges against Bruce. As a result of the charges, a court issued a no-contact order that led to James moving out of his home temporarily to live with his sister. James had also missed school on September 17, 1998 to participate in the resulting legal proceedings. In addition, in the preceding weeks, James had broken up with his girlfriend. The school authorities had become aware of this because the ex-girlfriend's mother had called the school to report that James was stalking her daughter.
 
 
 18
 Mulholland disclosed these events to Haney and Bleecker. Haney also reviewed James' disciplinary file, which recorded several additional incidents, including a fight in February 1998 and an episode of insubordination with a teacher in March 1997. Moreover, Haney said that a few weeks before October 2, 1998, he had personally disciplined James for wearing to school a T-shirt emblazoned with the words "eat shit and die." Haney's impression of James at that time was that he was a "good kid, but . . . somewhat of a`loner.' "
 
 
 19
 Given the content of the poem, and his knowledge of James' suicidal thoughts, family situation and past incidents, Haney decided at the Saturday meeting to call James' home to find out if James would be attending the school's homecoming dance that evening. Haney learned that James would not be attending the dance. Haney, nonetheless, decided to contact the Blaine Police Department for guidance about the situation. At the police department's suggestion, the school officials called Washington State's Child Protective Services, which then suggested they call the Community Mental Health Crisis Line. The Crisis Line in turn put them in touch with Dr. Charles Dewitt, the psychiatrist on duty for that evening. Dr. Dewitt suggested James be picked up by the police for evaluation.
 
 
 20
 The Whatcom Sheriff's Department, the law enforcement agency having jurisdiction over James' neighborhood, dispatched deputy sheriffs to the LaVines' family farm to conduct a welfare check of James. A deputy sheriff interviewed James to determine whether a medical evaluation was needed. James told the deputy that "he often writes poetry and has his teachers review them. He has never written this type of poem in the past and had no explanation why he wrote this one." James further told the officer he had no access to weapons and had no intention of carrying out any of the acts in the poem. James' mother assured the deputy that James had no access to weapons and was not a danger to himself or others. The deputy found no probable cause to commit James involuntarily, and James was unwilling to undergo a voluntary psychological examination.
 
 
 21
 The deputy telephoned Dr. Dewitt and reported his observations. Based upon Dr. Dewitt's conversation with the deputy and with the school officials, Dr. Dewitt concluded, "[i]n my professional opinion on a more probable than not basis based upon the information provided to me by the District and the law enforcement [officers] who had personally observed him, there were insufficient grounds for anyone to make a determination that James LaVine was in imminent danger of causing serious harm to himself and others." Dr. Dewitt accordingly decided not to commit James.
 
 
 22
 On Sunday, Haney met with Principal Dan Newell regarding James and informed him of James' background. By then, Newell had been informed that the sheriff and mental health professionals had decided not to commit James. That Sunday, based upon the information he had, Newell decided to"emergency expel" James under Washington Administrative Code §§ 180-40-295.[3] Haney left a message with James' parents that day telling them to attend a meeting the next morning at the school. At 8:00 a.m. on Monday, Newell told James and his father that James was being emergency expelled from school. This expulsion was formally expressed in a letter of the same date.[4] That letter in relevant part states:
 
 
 23
 This letter is to inform you of the following violations of the Blaine High School Discipline Policy by your son James:
 
 
 24
 On October 2, 1998 at 2:50 p.m., your son James presented a paper to his English teacher, which implied extreme violence to our student body.
 
 
 25
 This violation of [sic] was of a nature significant enough to be classified as dangerous to your son and/or a threat to other students and/or a threat of serious disruption to the education process. Therefore I impose the sanction of emergency expulsion.
 
 
 26
 After James' father was informed of the emergency expulsion, he became hostile and began using foul language. James, too, became upset, used profanity and ran out of the office.
 
 
 27
 After James was expelled, his parents hired an attorney, Breean Beggs, and appealed James' expulsion to the Blaine School Board. Beggs had several conversations with the school district's attorney, J. Timothy Slater, about how James could return to school. Slater suggested that James be evaluated by a psychiatrist, at the school district's expense, to determine whether it was safe for James to return to class. Once this proposal was agreed to, James met with Dr. Watson, a psychiatrist, on three occasions. After the third meeting on October 26, 1998, Dr. Watson felt he could recommend James' return to school. Dr. Watson also opined that when James turned in the poem, he needed to be evaluated and that he would have recommended removing James from school. Shortly thereafter, the school district rescinded its expulsion and James was allowed to return to school after missing 17 days. He completed the school year without incident.
 
 
 28
 Even though James was allowed to return to school, James and his parents continued with their appeal of the expulsion to the School Board. Concerned that the October 5 letter would hurt James' chances of entering the military, they requested that it be removed from James' file. After a hearing on December 15, 1998, the Board affirmed the expulsion, but agreed to rewrite the letter. A new, back-dated letter was substituted emphasizing that James was expelled for safety as opposed to disciplinary reasons; the revised letter did not refer to events that had transpired subsequent to October 5, 1998.
 
 
 29
 James and his father filed suit in federal court on July 6, 1999, claiming the Blaine School District, Tim Haney, Dan Newell and Karen Mulholland (collectively "the school" or "defendants") violated James' constitutional rights by expelling him and maintaining documentation in his school file. The suit asked for general and specific damages and for an order permanently enjoining defendants from maintaining any letters in James' file regarding his expulsion. Plaintiffs and defendants both moved for partial summary judgment on the First Amendment claim. The district court granted plaintiffs' motion and denied defendants' motion on February 24, 2000, at which time the court entered an injunction preventing the school district from placing or maintaining any negative documentation in James LaVine's school file.
 
 JURISDICTION
 
 30
 The district court had jurisdiction under 28 U.S.C.§§ 1331, because the complaint raised federal questions based upon alleged violations of the United States Constitution. The district court entered partial summary judgment in favor of the plaintiffs and granted the plaintiffs injunctive relief. In its order, the district court stated, "the LaVines are entitled to the equitable remedy of an injunction preventing the placement or maintenance of any negative documentation of this incident in James Lavine's school file." Defendants filed a timely notice of appeal of that order. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. §§ 1291(a)(1), because the district court's order granted a permanent injunction. Dare v. California, 191 F.3d 1167, 1170 (9th Cir. 1999). Because the district court's partial summary judgment order provides legal authority for the injunction and is thus inextricably bound with it, we also have jurisdiction to review the legal authority underlying the injunction. Id.; Paige v. California, 102 F.3d 1035, 1040 (9th Cir. 1996).
 
 STANDARD OF REVIEW
 
 31
 We review for abuse of discretion the district court's imposition of a permanent injunction, but review any determination underlying the grant of the injunction by the standard that applies to that determination. Dare, 191 F.3d at 1170. A district court's grant or denial of summary judgment is reviewed de novo. Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc); Laborers Health & Welfare Trust v. Westlake Dev., 53 F.3d 979, 981 (9th Cir. 1995). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, (a) "the district court correctly applied the relevant substantive law" and (b) there are no genuine issues of material fact. Id.
 
 DISCUSSION
 
 32
 As we noted at the outset, we live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis. The recent spate of school shootings have put our nation on edge and have focused attention on what school officials, law enforcement and others can do or could have done to prevent these kinds of tragedies. After Columbine, Thurston, Santee and other school shootings, questions have been asked about how teachers or administrators could have missed telltale "warning signs, " why something was not done earlier and what should be done to prevent such tragedies from happening again.
 
 
 33
 Although schools are being asked to do more to prevent violence, the Constitution sets limits as to how far they can go. Just as the Constitution does not allow the police to imprison all suspicious characters, schools cannot expel students just because they are "loners," wear black and play video games. See Kevin Fagan, Life Harder for Teen Outcasts: For Some Bay Area Kids, Times Are Tougher Since Littleton, S.F. Chron., May 7, 1999, at A1 (listing attributes routinely ascribed to potential school shooters). Schools must achieve a balance between protecting the safety and wellbeing of their students and respecting those same students' constitutional rights. See Karp v. Becken, 477 F.2d 171, 174 (9th Cir. 1973); cf. New Jersey v. T.L.O., 469 U.S. 325, 33940 (1985) (balancing, in the Fourth Amendment context, students' interest in privacy against schools' interest in maintaining discipline and security).
 
 
 34
 The LaVines, in this lawsuit, argue that the school failed to reach the proper balance when it expelled James. They contend that James' poem is protected by the First Amendment and that he was unconstitutionally disciplined for the content of his speech. The school argues that James was not disciplined because of the poem, but was expelled based upon a confluence of factors, including the poem, that indicated he was a danger to the safety of the school and to himself.
 
 
 35
 To determine whether the school violated James' First Amendment rights, we must consider what those rights are. Public school students are protected by the First Amendment and do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969) (upholding students' right to wear black armbands in protest against the Vietnam War). The First Amendment rights of public school students, however, " `are not automatically coextensive with the rights of adults in other settings' " and must be " `applied in light of the special characteristics of the school environment.' " Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (holding school principal could censor the student newspaper) (quoting Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986) (holding school could punish students for making lewd remarks at school assembly), and Tinker, 393 U.S. at 506, respectively). For example, a school need not tolerate student speech that is inconsistent with its basic educational mission. Hazelwood , 484 U.S. at 266; compare Chandler v. McMinnville Sch. Dist. , 978 F.2d 524, 527-31 (9th Cir. 1992) (holding students had pled a First Amendment violation where they alleged they had to remove buttons containing the word "scab" during a teachers' strike).
 
 
 36
 In the school context, we have granted educators substantial deference as to what speech is appropriate."[T]he daily administration of public education is committed to school officials. Epperson v. Arkansas, 393 U.S. 97, 104 (1968). That responsibility carries with it the inherent authority to prescribe and control conduct in the schools." Karp, 477 F.2d at 174. States have a compelling interest in their educational system, and a balance must be met between the First Amendment rights of students and preservation of the educational process. Id. As a consequence, courts are not in the best position to decide what schoolhouse speech restrictions are appropriate. Chandler, 978 F.2d at 527. " `[T]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,' rather than with the federal courts." Hazelwood, 484 U.S. at 267 (quoting Fraser, 478 U.S. at 683) (internal citation omitted).
 
 
 37
 With that said, deference does not mean abdication; there are situations where school officials overstep their bounds and violate the Constitution. In deciding whether school officials have infringed a student's First Amendment rights, we must first determine what type of student speech is at issue. In Chandler, we "discerned three distinct areas of student speech," each of which is governed by different Supreme Court precedent:
 
 
 38
 (1) vulgar, lewd, obscene and plainly offensive speech is governed by Fraser;
 
 
 39
 (2) school-sponsored speech is governed by Hazelwood; and(3) speech that falls into neither of these categories is governed by Tinker. Chandler, 978 F.2d at 529.
 
 
 40
 James' poem clearly falls within the third category.[5]
 
 
 41
 "Last Words" is not vulgar, lewd, obscene or plainly offensive. It is not "an elaborate, graphic, and explicit sexual metaphor" as was the student's speech in Fraser , nor does it contain the infamous seven words that cannot be said on the public airwaves. See FCC v. Pacifica Found., 438 U.S. 726 (1978) (holding FCC could sanction a radio station for broadcasting George Carlin's "Filthy Words" monologue). Further, the poem was not "school sponsored" speech. It was not a "speech or speech-related activit[y] that`students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.' " Chandler , 978 F.2d at 529 (quoting Hazelwood, 484 U.S. at 271). Unlike the school assembly in Fraser, or the school newspaper in Hazelwood, no one could reasonably perceive James' poem to have the imprimatur of the school. It was not an assignment, it was not published in a school publication and James showed it only to several students and his teacher, Ms. Bleecker.
 
 
 42
 To suppress speech falling within Chandler's "all other speech" category, school officials must justify their decision by showing "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." Tinker , 393 U.S. at 514. Tinker does not require school officials to wait until disruption actually occurs before they may act. Chandler, 978 F.2d at 529; Karp, 477 F.2d at 175. "In fact, they have a duty to prevent the occurrence of disturbances." Id . (quoting Karp, 477 F.2d at 175). Forecasting disruption is unmistakably difficult to do. Tinker does not require certainty that disruption will occur, "but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption." Karp, 477 F.2d at 175.
 
 
 43
 In applying Tinker, we look to the totality of the relevant facts. Id. at 174. We look not only to James' actions, but to all of the circumstances confronting the school officials that might reasonably portend disruption. Id. at 175. When we look to all of the relevant facts here, we conclude that the school did not violate the First Amendment when it emergency expelled James.
 
 
 44
 The school had a duty to prevent any potential violence on campus to James or to other students. When the school officials made their decision not to allow James to attend class on Monday morning, they were aware of a substantial number of facts that in isolation would probably not have warranted their response, but in combination gave them a reasonable basis for their actions. The school was aware that James previously had suicidal ideations that he had shared with school officials. The officials were aware that James was involved in a domestic dispute where he was forced to move out of his family home. James told Mulholland that his filing charges against his father caused financial pressure on his family because of the legal costs associated with his father's defense, and that in turn his family placed pressure upon him to rescind his allegations. The school was also aware that in the past weeks James had broken up with his girlfriend and he was reportedly stalking her. Moreover, James had had several disciplinary problems in the past, at least one of which involved some violence. Further, in the three days prior to turning in the poem, James had been absent from school, a cause of concern.
 
 
 45
 Last, and maybe most importantly, there was the poem itself. "Last Words" is filled with imagery of violent death and suicide. At its extreme it can be interpreted as a portent of future violence, of the shooting of James' fellow students. Even in its most mild interpretation, the poem appears to be a "cry for help" from a troubled teenager contemplating suicide. Taken together and given the backdrop of actual school shootings, we hold that these circumstances were sufficient to have led school authorities reasonably to forecast substantial disruption of or material interference with school activities --specifically, that James was intending to inflict injury upon himself or others.
 
 
 46
 It is true that the Whatcom Sheriff's Department and Dr. Dewitt did not believe James should be involuntarily committed, but the standard for involuntary commitment is not the same as that for school officials to take action. To commit a minor 13 years of age or older involuntarily in Washington State, a mental health professional must conclude that the minor is suffering from a mental disorder and presents a likelihood of serious harm. See WASH. REV. CODE §§ 71.34.050. Under Tinker, there is no requirement that the student be mentally ill and likely to cause serious harm. Indeed, because of the special circumstances of the school environment, the level of disturbance required to justify official intervention is lower inside a public school than it is outside the school. Karp, 477 F.2d at 175.
 
 
 47
 Given the potential for substantial disruption, we cannot fault the school's response.[6] In Washington, if school officials want to immediately bar a student from coming to school for safety purposes, they have only one option emergency expulsion under Washington Administrative Code §§ 180-40-295. Under §§ 180 40-295, if school officials have "good and sufficient reason to believe that the student's presence poses an immediate and continuing danger to the student, other students, or school personnel or an immediate and continuing threat of substantial disruption of the educational process," they can emergency expel the student until they deem it safe for the student to return. Here, after emergency expelling James, the school allowed him to return to classes as soon as he was evaluated by a psychiatrist who determined in his professional opinion that James was not a threat to himself or others.[7] Considering all of the relevant facts and the totality of the circumstances, we hold that the school's emergency expulsion was reasonable and did not violate the First Amendment.
 
 
 48
 The LaVines contend that James was expelled for the content of his poem and that the school's actions were punitive and not meant to protect the safety of James or others. They believe this is evidenced by the original expulsion letter, Haney's and Newell's testimony before the school board, references in James' file and other documents. Even viewing these items of evidence in the perspective most favorable to the LaVines, our conclusion is unchanged. The content of James' poem was admittedly a factor in the decision to emergency expel James. It is because the content of James' speech was a factor in the decision that we analyze the school defendants' actions to determine whether they violated the First Amendment at all. There is undisputed evidence in the record, however, that Principal Newell considered other factors beyond the poem in deciding to emergency expel James.[8] Newell stated that he considered James' suicidal ideations, disciplinary history, family situation, recent break-up with his girlfriend and the report of stalking her and the recent school shooting in nearby Springfield in addition to the content of the poem when he made his final decision.
 
 
 49
 The record is also clear that in addition to any potential disciplinary violation James may or may not have committed by writing the poem, the school was foremost concerned about student safety. This is primarily evidenced by the actions the school took immediately after James turned in the poem. As soon as James' teacher read the poem, she became worried about James' well being and called his school counselor. The counselor then read the poem, was also troubled by its content and called the school's vice principal. All three school officials then met on Saturday evening because they were concerned about what they should do to protect the student body's safety. Their first concern was the homecoming dance scheduled for that night. Haney decided to call James' home to see if he planned to attend the dance. Even though James said he would not be attending, Haney decided to warn security at the dance to be on the look-out for James. The three school officials then decided to call the police for help in this situation and were referred to a crisis hotline and eventually a psychiatrist. After discussing the situation with the psychiatrist, they decided that James should be evaluated by a mental health professional. Deputy sheriffs went to James' home for that purpose but, after James refused to be voluntarily examined, concluded that they lacked probable cause under Washington law to commit him. Taken together, the school's actions on the weekend before they emergency expelled him substantiate that it was not trying to discipline James for his speech, but was trying to protect its students from potential violence.[9]
 
 
 50
 In retrospect, it may appear that, as James' mother predicted, the school overreacted. James very well may have been using his poetry to explore the disturbing topic of school violence and chose to do so through the perspective of a suicidal mass murderer. In fact, James strongly contends this was all he was doing and that he had no intention of hurting himself or others. We have no reason now to disbelieve James, as he did return to Blaine High School without further incident. We review, however, with deference, schools' decisions in connection with the safety of their students even when freedom of expression is involved. At the time the school officials made their determination to emergency expel James, they had facts which might reasonably have led them to forecast a substantial disruption of or material interference with school activities. See Tinker, 393 U.S. at 514. School officials have a difficult task in balancing safety concerns against chilling free expression. This case demonstrates how difficult that task can be.
 
 
 51
 That said, even though we conclude that emergency expelling James did not violate the First Amendment, the same cannot be said for the school's placement and maintenance in James' file of what the district court characterized as "negative documentation." The school need not permanently blemish James' record and harm his ability to secure future employment. We recognize that the school may have had justification to document contemporaneously the reasons for its emergency expulsion, but the revised October 5, 1998 letter was written and maintained in James' file after the perceived threat had subsided, the school had allowed James to return to classes and had satisfied itself that James was not a threat to himself or others. As such, it created a permanent indictment of James without reference to the later, ameliorating events and thus went beyond the school's legitimate documentation needs. Accordingly, we affirm the district court's injunction prohibiting the placement or maintenance of any such negative documentation in James' file.
 
 
 52
 For the foregoing reasons we AFFIRM in part and REVERSE in part the district court's grant of partial summary judgment in favor of the plaintiffs and AFFIRM the injunction entered prohibiting the placement or maintenance of negative documentation in James' file. Because we conclude that even viewing the evidence in the light most favorable to the plaintiffs there is no genuine issue of material fact in dispute with regard to the expulsion claim, we also REVERSE in part the denial of partial summary judgment in favor of the defendants on this limited issue. REMANDED for further proceedings consistent with this opinion. Each side to bear its own costs.
 
 
 53
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 Notes:
 
 
 *
 Honorable William W Schwarzer, Senior District Judge for the Northern District of California, sitting by designation.
 
 
 [1]
 All of these facts are undisputed.
 
 
 [2]
 On May 21, 1998, a 15-year-old freshman, suspended a day earlier for bringing a gun to school, shot and killed two students and injured 25 others at Thurston High School. See Maxine Bernstein, Kinkel Gets Life in Prison, Portland Oregonian, Nov. 11, 1999, at A1.
 
 
 [3]
 WASH. ADMIN. CODE §§ 180-40-295 provides: Notwithstanding any other provision of this chapter, a student may be expelled immediately by a school district superintendent or a designee of the superintendent in emergency situations: Provided, That the superintendent or designee has good and sufficient reason to believe that the student's presence poses an immediate and continuing danger to the student, other students, or school personnel or an immediate and continuing threat of substantial disruption of the educational process. An emergency expulsion shall continue until rescinded by the superintendent or his or her designee, or until modified or reversed pursuant to the hearing provisions set forth in WAC 180-40-305 or the appeal provisions set forth in WAC 180-40-315.
 
 
 [4]
 The record is unclear as to whether this letter was given to the LaVines at the Monday meeting or at some later time.
 
 
 [5]
 The school argues that James' poem was a "true threat" and not protected by the First Amendment at all. See Lovell v. Poway Unified Sch. Dist., 90 F.3d 367, 371 (9th Cir. 1996). Because we conclude that even if the poem was protected speech, the school's actions were justified, we need not resolve this issue.
 
 
 [6]
 Various governmental agencies, including the United States Department of Education and Department of Justice, as well as other organizations have begun to address school violence issues, and to provide resources to schools and communities to deal with the problem. See, e.g., U.S. Dept. of Justice, Youth Violence, www.usdoj.gov/youthviolence.htm.
 
 
 [7]
 The cooperative arrangement between the school and the LaVines to provide counseling and evaluation is commendable. Simply expelling a student without providing some kind of counseling or supervision might not be the best response to a school's concern for potential violence. See, e.g., Maxine Bernstein, Kinkel Gets Life in Prison, Portland Oregonian, Nov. 11, 1999, at A1 (describing how the school shooter had been suspended by the school the day before he committed his murders); see also note 6, supra.
 
 
 [8]
 There was testimony by Vice Principal Haney that he would have emergency expelled anyone who wrote "Last Words. " Whether the school may have expelled anyone for writing this poem is not what the school must defend here, however. The school must only defend its decision to emergency expel James.
 
 
 [9]
 Additionally, the school's actions after it emergency expelled James evidence that it was acting out of safety as opposed to disciplinary concerns. The school allowed James to return to class as soon as a mental health professional determined he was not a threat to himself or his classmates.