**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN DARIANO; DIANNA DARIANO, on behalf of their minor child, M.D.; KURT FAGERSTROM; JULIE ANN FAGERSTROM, on behalf of their minor child, D.M.; KENDALL JONES; JOY JONES, on behalf of their minor child, D.G., *Plaintiffs-Appellants*, | No. 11-17858 D.C. No. 5:10-cv-02745-JW |
| v. | |
| MORGAN HILL UNIFIED SCHOOL DISTRICT; NICK BODEN, in his official capacity as Principal, Live Oak High School; MIGUEL RODRIGUEZ, in his individual and official capacity as Assistant Principal, Live Oak High School, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
October 17, 2013—San Francisco, California

Filed February 27, 2014

Before: Sidney R. Thomas and M. Margaret McKeown, Circuit Judges, and Virginia M. Kendall, District Judge.[*]

Opinion by Judge McKeown

**SUMMARY**[**]

**Civil Rights**

The panel affirmed the district court's summary judgment in a civil rights suit brought by high school students who were asked to remove clothing bearing images of the American flag after school officials learned of threats of race-related violence during a school-sanctioned celebration of Cinco de Mayo.

The panel held that school officials did not violate the students' rights to freedom of expression, due process, or equal protection. The panel held given the history of prior events at the school, including an altercation on campus, it was reasonable for school officials to proceed as though the threat of a potentially violent disturbance was real. The panel held that school officials anticipated violence or substantial disruption of or material interference with school activities, and their response was tailored to the circumstances.

[*] The Honorable Virginia M. Kendall, District Judge for the U.S. District Court for the Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Robert J. Muise (argued), American Freedom Law Center, Ann Arbor, Michigan; William J. Becker, Jr., The Becker Law Firm, Los Angeles, California; Erin Mersino, Thomas More Law Center, Ann Arbor, Michigan, for Plaintiffs-Appellants.

Don Willenburg (argued), Mark S. Posard, and Alyson S. Cabrera, Gordon & Rees LLP, San Francisco, California, for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

We are asked again to consider the delicate relationship between students' First Amendment rights and the operational and safety needs of schools. As we noted in *Wynar v. Douglas County School District*, 728 F.3d 1062, 1064 (9th Cir. 2013), "school administrators face the daunting task of evaluating potential threats of violence and keeping their students safe without impinging on their constitutional rights." In this case, after school officials learned of threats of race-related violence during a school-sanctioned celebration of Cinco de Mayo, the school asked a group of students to remove clothing bearing images of the American flag.[1]

The students brought a civil rights suit against the school district and two school officials, alleging violations of their

---

[1] Because the students' names are confidential, we refer to them collectively as "the students," or by their initials, M.D., D.G., and D.M.

federal and state constitutional rights to freedom of expression, equal protection, and due process. We affirm the district court's grant of summary judgment as to the only defendant party to this appeal, Assistant Principal Miguel Rodriguez, and its denial of the students' motion for summary judgment, on all claims. School officials anticipated violence or substantial disruption of or material interference with school activities, and their response was tailored to the circumstances. As a consequence, we conclude that school officials did not violate the students' rights to freedom of expression, due process, or equal protection.

## BACKGROUND

This case arose out of the events of May 5, 2010, Cinco de Mayo, at Live Oak High School ("Live Oak" or "the School"), part of the Morgan Hill Unified School District in Northern California. The Cinco de Mayo celebration was presented in the "spirit of cultural appreciation." It was described as honoring "the pride and community strength of the Mexican people who settled this valley and who continue to work here." The school likened it to St. Patrick's Day or Oktoberfest. The material facts are not in dispute.

Live Oak had a history of violence among students, some gang-related and some drawn along racial lines. In the six years that Nick Boden served as principal, he observed at least thirty fights on campus, both between gangs and between Caucasian and Hispanic students. A police officer is stationed on campus every day to ensure safety on school grounds.

On Cinco de Mayo in 2009, a year before the events relevant to this appeal, there was an altercation on campus

between a group of predominantly Caucasian students and a group of Mexican students.[2] The groups exchanged profanities and threats. Some students hung a makeshift American flag on one of the trees on campus, and as they did, the group of Caucasian students began clapping and chanting "USA." A group of Mexican students had been walking around with the Mexican flag, and in response to the white students' flag-raising, one Mexican student shouted "f*** them white boys, f*** them white boys." When Assistant Principal Miguel Rodriguez told the student to stop using profane language, the student said, "But Rodriguez, they are racist. They are being racist. F*** them white boys. Let's f*** them up." Rodriguez removed the student from the area.

At least one party to this appeal, student M.D., wore American flag clothing to school on Cinco de Mayo 2009. M.D. was approached by a male student who, in the words of the district court, "shoved a Mexican flag at him and said something in Spanish expressing anger at [M.D.'s] clothing."

A year later, on Cinco de Mayo 2010, a group of Caucasian students, including the students bringing this appeal, wore American flag shirts to school. A female student approached M.D. that morning, motioned to his shirt, and asked, "Why are you wearing that? Do you not like Mexicans[?]" D.G. and D.M. were also confronted about their clothing before "brunch break."

---

[2] We use the ethnic and racial terminology employed by the district court (Caucasian, Hispanic, Mexican). For example, the district court at times referred to students of Mexican origin born in the United States and students born in Mexico collectively as "Mexican." We adopt the same practice here, for the limited purpose of clarifying the narrative.

As Rodriguez was leaving his office before brunch break, a Caucasian student approached him, and said, "You may want to go out to the quad area. There might be some—there might be some issues." During the break, another student called Rodriguez over to a group of Mexican students, said that she was concerned about a group of students wearing the American flag, and said that "there might be problems." Rodriguez understood her to mean that there might be a physical altercation. A group of Mexican students asked Rodriguez why the Caucasian students "get to wear their flag out when we [sic] don't get to wear our [sic] flag?"

Boden directed Rodriguez to have the students either turn their shirts inside out or take them off. The students refused to do so.

Rodriguez met with the students and explained that he was concerned for their safety. The students did not dispute that their attire put them at risk of violence. Plaintiff D.M. said that he was "willing to take on that responsibility" in order to continue wearing his shirt. Two of the students, M.D. and D.G., said they would have worn the flag clothing even if they had known violence would be directed toward them.

School officials permitted M.D. and another student not a party to this action to return to class, because Boden considered their shirts, whose imagery was less "prominent," to be "less likely [to get them] singled out, targeted for any possible recrimination," and "significant[ly] differen[t] in [terms of] what [he] saw as being potential for targeting."[3]

---

[3] The students permitted to return to class were wearing "Tap Out" (or "TapouT") shirts, which bear the logo of a popular martial arts company, sometimes (as here) with flag iconography.

The officials offered the remaining students the choice either to turn their shirts inside out or to go home for the day with excused absences that would not count against their attendance records. Students D.M. and D.G. chose to go home. Neither was disciplined.

In the aftermath of the students' departure from school, they received numerous threats from other students. D.G. was threatened by text message on May 6, and the same afternoon, received a threatening phone call from a caller saying he was outside of D.G.'s home. D.M. and M.D. were likewise threatened with violence, and a student at Live Oak overheard a group of classmates saying that some gang members would come down from San Jose to "take care of" the students. Because of these threats, the students did not go to school on May 7.

The students and their parents, acting as guardians, brought suit under 42 U.S.C. § 1983 and the California Constitution against Morgan Hill Unified School District ("the District"); and Boden and Rodriguez, in their official and individual capacities, alleging violations of their federal and California constitutional rights to freedom of expression and their federal constitutional rights to equal protection and due process.

On cross-motions for summary judgment, the district court granted Rodriguez's motion on all claims and denied the students' motion on all claims, holding that school officials did not violate the students' federal or state constitutional rights. The district court did not address claims against Boden, because he was granted an automatic stay in bankruptcy. The district court dismissed all claims against the District on grounds of sovereign immunity, a ruling not

challenged on appeal. The question on appeal is thus whether Rodriguez, in his official or individual capacity, violated the students' constitutional rights.

## ANALYSIS

## I.  FIRST AMENDMENT CLAIMS

We analyze the students' claims[4] under the well-recognized framework of *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).[5] Under *Tinker*, students may "express [their] opinions, even on controversial subjects . . . if [they] do[] so without materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others." *Id.* at 513 (final alteration in original) (internal quotation marks omitted). To "justify prohibition of a particular expression of opinion," school officials "must be able to show that [their] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509.

---

[4] Because California follows federal law for free expression claims arising in the school setting, the students' federal and state claims stand or fall together. *Cal. Teachers Ass'n v. Governing Bd. of San Diego Unified Sch. Dist.*, 45 Cal. App. 4th 1383, 1391–92 (1996).

[5] As we noted in *Wynar*, 728 F.3d at 1067, student speech that is "vulgar, lewd, obscene [or] plainly offensive" is governed by *Bethel School District Number 403 v. Fraser*, 478 U.S. 675 (1986); speech that is "school-sponsored" is governed by *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988); and speech that "falls into neither of these categories" is governed by *Tinker*. *See Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992) (listing standards).

That said, "conduct by the student, in class or out of it, which for any reason— whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. Under *Tinker*, schools may prohibit speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities," or that constitutes an "actual or nascent [interference] with the schools' work or . . . collision with the rights of other students to be secure and to be let alone." *Id.* at 508, 514; *see also Wynar*, 728 F.3d at 1067 (quoting *Tinker*, 393 U.S. at 508, 514.). As we have explained, "the First Amendment does not require school officials to wait until disruption actually occurs before they may act. In fact, they have a duty to prevent the occurrence of disturbances." *Karp v. Becken*, 477 F.2d 171, 175 (9th Cir. 1973) (footnote omitted). Indeed, in the school context, "the level of disturbance required to justify official intervention is relatively lower in a public school than it might be on a street corner." *Id.*

Although *Tinker* guides our analysis, the facts of this case distinguish it sharply from *Tinker*, in which students' "pure speech" was held to be constitutionally protected. 393 U.S. at 508. In contrast to *Tinker*, in which there was "no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone," *id.*, there was evidence of nascent and escalating violence at Live Oak. On the morning of May 5, 2010, each of the three students was confronted about their clothing by other students, one of whom approached student M.D. and asked, "Why are you wearing that? Do you not like Mexicans[?]" Before the

brunch break, Rodriguez learned of the threat of a physical altercation. During the break, Rodriguez was warned about impending violence by a second student. The warnings of violence came, as the district court noted, "in [the] context of ongoing racial tension and gang violence within the school, and after a near-violent altercation had erupted during the prior Cinco de Mayo over the display of an American flag." Threats issued in the aftermath of the incident were so real that the parents of the students involved in this suit kept them home from school two days later.

The minimal restrictions on the students were not conceived of as an "urgent wish to avoid the controversy," as in *Tinker*, *id.* at 510, or as a trumped-up excuse to tamp down student expression. The controversy and tension remained, but the school's actions presciently avoided an altercation. Unlike in *Tinker*, where "[e]ven an official memorandum prepared after the [students'] suspension that listed the reasons for the ban on wearing the armbands made no reference to the anticipation of such disruption," *id.* at 509, school officials here explicitly referenced anticipated disruption, violence, and concerns about student safety in conversations with students at the time of the events, in conversations the same day with the students and their parents, and in a memorandum and press release circulated the next day.

In keeping with our precedent, school officials' actions were tailored to avert violence and focused on student safety, in at least two ways. For one, officials restricted the wearing of certain clothing, but did not punish the students. School officials have greater constitutional latitude to suppress student speech than to punish it. In *Karp*, we held that school officials could "curtail the exercise of First Amendment

rights when they c[ould] reasonably forecast material interference or substantial disruption," but could not discipline the student without "show[ing] justification for their action." 477 F.2d at 176; *cf. Wynar*, 728 F.3d at 1072 (upholding expulsion, despite its "more punitive character," as a justified response to threats); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 992 (9th Cir. 2001).

For another, officials did not enforce a blanket ban on American flag apparel, but instead allowed two students to return to class when it became clear that their shirts were unlikely to make them targets of violence. The school distinguished among the students based on the perceived threat level, and did not embargo all flag-related clothing. *See* Background, *supra*.

Finally, whereas the conduct in *Tinker* expressly did "not concern aggressive, disruptive action or even group demonstrations," 393 U.S. at 508, school officials at Live Oak reasonably could have understood the students' actions as falling into any of those three categories, particularly in the context of the 2009 altercation. The events of 2010 took place in the shadow of similar disruptions a year earlier, and pitted racial or ethnic groups against each other. Moreover, students warned officials that there might be physical fighting at the break.

Our role is not to second-guess the decision to have a Cinco de Mayo celebration or the precautions put in place to avoid violence. "We review . . . with deference[] schools' decisions in connection with the safety of their students even when freedom of expression is involved," keeping in mind that "deference does not mean abdication." *LaVine*, 257 F.3d at 988, 992. As in *Wynar*, the question here is not whether the

threat of violence was real, but only whether it was "reasonable for [the school] to proceed as though [it were]." 728 F.3d at 1071; *Karp*, 477 F.2d at 175 (noting that "*Tinker* does not demand a certainty that disruption will occur, but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption"). Here, both the specific events of May 5, 2010, and the pattern of which those events were a part made it reasonable for school officials to proceed as though the threat of a potentially violent disturbance was real. We hold that school officials, namely Rodriguez, did not act unconstitutionally, under either the First Amendment or Article I, § 2(a) of the California Constitution, in asking students to turn their shirts inside out, remove them, or leave school for the day with an excused absence in order to prevent substantial disruption or violence at school.

## II. EQUAL PROTECTION CLAIM

The students' equal protection claim is a variation of their First Amendment challenge. *Cf.* U.S. CONST. amend. XIV, § 1 (stating that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws"). They allege that they were treated differently than students wearing the colors of the Mexican flag, and that their speech was suppressed because their viewpoint was disfavored. We note that the students had no response when asked why they chose to wear flag clothing on the day in question. The school responds that it had a viewpoint-neutral reason—student safety—for suppressing the speech in question, and that they treated "all students for whose safety they feared in the same manner."

Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and the Equal Protection Clause. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 n.4 (1992) (noting that the Supreme Court "has occasionally fused the First Amendment into the Equal Protection Clause in this fashion, but . . . with the acknowledgment . . . that the First Amendment underlies its analysis"). Where plaintiffs allege violations of the Equal Protection Clause relating to expressive conduct, we employ "essentially the same" analysis as we would in a case alleging only content or viewpoint discrimination under the First Amendment. *Barr v. Lafon*, 538 F.3d 554, 575 (6th Cir. 2008).

In the school context, we look again to *Tinker*. 393 U.S. at 510; *see also Barr*, 538 F.3d at 576–77; *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 (5th Cir. 2004) (stating that *Tinker* "applies to school regulations directed at specific student viewpoints"). According to *Tinker*, schools are not forced to "prohibit the wearing of all symbols of political or controversial significance" in order to justify a prohibition against the wearing of a certain symbol, if such a prohibition is "necessary to avoid material and substantial interference with schoolwork or discipline." 393 U.S. at 510–11. Schools may, under *Tinker*, ban certain images, for example images of the Confederate flag on clothing, even though such bans might constitute viewpoint discrimination. *See, e.g.*, *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1184–85 (9th Cir. 2006) (noting that "[w]hile the Confederate flag may express a particular viewpoint, '[i]t is not only constitutionally allowable for school officials' to limit the expression of racially explosive views, 'it is their duty to do so'" (alteration in original) (quoting *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1249 (11th Cir. 2003) (per

curiam)), *judgment vacated on other grounds sub nom. Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007); *Scott*, 324 F.3d at 1248 (upholding district court order barring Confederate symbols based on "the potential disruption that the displaying of Confederate symbols would likely create"); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366–67 (10th Cir. 2000) (upholding ban on Confederate symbols based on a "series of racial incidents or confrontations," including "hostile confrontations between a group of white and black students").

As the district court noted, the students offered no evidence "demonstrating that students wearing the colors of the Mexican flag were targeted for violence." The students offered no evidence that students at a similar risk of danger were treated differently, and therefore no evidence of impermissible viewpoint discrimination.

Because the record demonstrates that the students' shirts "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," *Tinker*, 393 U.S. at 514, the authorities' actions were permissible under *Tinker*. We reject the students' equal protection claim.

## III.     DUE PROCESS AND INJUNCTIVE RELIEF CLAIMS

The students further challenge the District's dress code, which prohibits clothing that "indicate[s] gang affiliation, create[s] a safety hazard, or disrupt[s] school activities." They seek to permanently enjoin the use of the dress code, claiming that it fails to provide objective standards by which to referee

student attire, in violation of the Due Process Clause.[6] We reject the students' due process claims.

The Supreme Court has "recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures," and has thus specified that, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code . . . . " *Bethel Sch. Dist.*, 478 U.S. at 686 (holding that a school had not violated a student's due process rights by disciplining him for lewd speech under a policy prohibiting "obscene" speech).

The District's dress code is in line with others that the federal courts have held to be permissible. *See, e.g.*, *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 441, 444 (4th Cir. 2013) (upholding code prohibiting "disrupt[ive]" or "offensive" clothing, including clothing that "distract[s]" or "interfere[s]"), *cert. denied*, 134 S. Ct. 201 (2013); *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 224 (5th Cir. 2009) (upholding code prohibiting clothing with "inappropriate symbolism").

Significantly, the dress code challenged here incorporates the standards sanctioned in *Tinker*: safety and disruption. *See B.W.A. v. Farmington R-7 Sch. Dist.*, 508 F. Supp. 2d 740, 750–51 (E.D. Mo. 2007) (holding that a dress code that contains language that "tracks *Tinker*" poses "no real danger"

---

[6] Although the District is not a party to this appeal, we consider the students' dress code claims because they brought suit against Rodriguez in his official capacity.

of compromising the First Amendment rights of students), *aff'd* 554 F.3d 734 (8th Cir. 2009); *see also Hardwick*, 711 F.3d at 441. It would be unreasonable to require a dress code to anticipate every scenario that might pose a safety risk to students or that might substantially disrupt school activities. Dress codes are not, nor should they be, a school version of the Code of Federal Regulations. It would be equally unreasonable to hold that school officials could not, at a minimum, rely upon the language *Tinker* gives them.

We affirm the district court's holding that the policy is not unconstitutionally vague and does not violate the students' right to due process.

**AFFIRMED.**