**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DARIANO; DIANNA DARIANO, on behalf of their minor child, M.D.; KURT FAGERSTROM; JULIE ANN FAGERSTROM, on behalf of their minor child, D.M.; KENDALL JONES; JOY JONES, on behalf of their minor child, D.G.,

*Plaintiffs-Appellants*,

v.

MORGAN HILL UNIFIED SCHOOL DISTRICT; NICK BODEN, in his official capacity as Principal, Live Oak High School; MIGUEL RODRIGUEZ, in his individual and official capacity as Assistant Principal, Live Oak High School,

*Defendants-Appellees*.

No. 11-17858

D.C. No. 5:10-cv-02745-JW

ORDER AND AMENDED OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
October 17, 2013—San Francisco, California

Filed February 27, 2014

Amended September 17, 2014

Before: Sidney R. Thomas and M. Margaret McKeown, Circuit Judges, and Virginia M. Kendall, District Judge.[*]

Order;
Dissent to Order by Judge O'Scannlain
Opinion by Judge McKeown

**SUMMARY**[**]

**Civil Rights**

The panel amended its prior opinion, appearing at 745 F.3d 354 (9th Cir. 2014), filed an amended opinion, denied a petition for panel rehearing, denied a petition for rehearing en banc on behalf of the court, and ordered that no further petitions shall be permitted.

The panel affirmed the district court's summary judgment in a civil rights suit brought by high school students who were asked to remove clothing bearing images of the American flag after school officials learned of threats of race-related violence during a school-sanctioned celebration of Cinco de Mayo.

---

[*] The Honorable Virginia M. Kendall, District Judge for the U.S. District Court for the Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that school officials did not violate the students' rights to freedom of expression, due process, or equal protection.  Recognizing that, in certain contexts, limiting speech because of reactions to the speech may give rise to concerns about a "heckler's veto," the panel held that in the school context, the crucial distinction is the nature of the speech, not the source of it.  The panel noted that prior cases do not distinguish between "substantial disruption" caused by the speaker and "substantial disruption" caused by the reactions of others.  The panel held that given the history of prior events at the school, including an altercation on campus, it was reasonable for school officials to proceed as though the threat of a potentially violent disturbance was real. The panel held that school officials anticipated violence or substantial disruption of or material interference with school activities, and their response was tailored to the circumstances.

Dissenting from the denial of rehearing en banc, Judge O'Scannlain, joined by Judges Tallman and Bea, would hold that the reaction of other students to the student speaker is not a legitimate basis for suppressing student speech absent a showing that the speech in question constitutes fighting words, a true threat, incitement to imminent lawless action, or other speech outside the First Amendment's protection.

## COUNSEL

Robert J. Muise (argued), American Freedom Law Center, Ann Arbor, Michigan; William J. Becker, Jr., The Becker Law Firm, Los Angeles, California; Erin Mersino, Thomas More Law Center, Ann Arbor, Michigan, for Plaintiffs-Appellants.

Don Willenburg (argued), Mark S. Posard, and Alyson S. Cabrera, Gordon & Rees LLP, San Francisco, California, for Defendants-Appellees.

**ORDER**

The opinion filed on February 27, 2014, appearing at 745 F.3d 354 (9th Cir. 2014), is hereby amended. An amended opinion is filed concurrently with this order.

With these amendments, the panel has voted to deny the petition for panel rehearing.

The full court has been advised of the petition for rehearing and rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for panel rehearing and petition for rehearing en banc are **DENIED**. No further petitions for en banc or panel rehearing shall be permitted.

Judge O'Scannlain's dissent from denial of rehearing en banc is filed concurrently with this Order.

The motion for en banc consideration of the motion of the Alliance Defending Freedom for leave to file an amicus brief is moot.

O'SCANNLAIN, Circuit Judge, joined by TALLMAN and BEA, Circuit Judges, dissenting from the denial of rehearing en banc:

The freedom of speech guaranteed by our Constitution is in greatest peril when the government may suppress speech simply because it is unpopular.  For that reason, it is a foundational tenet of First Amendment law that the government cannot silence a speaker because of how an audience might react to the speech.  It is this bedrock principle—known as the heckler's veto doctrine—that the panel overlooks, condoning the suppression of free speech by some students because *other students* might have reacted violently.

In doing so, the panel creates a split with the Seventh and Eleventh Circuits and permits the will of the mob to rule our schools.  For these reasons, I must respectfully dissent from our refusal to hear this case en banc.

I

On May 5, 2010, Cinco de Mayo, a group of Caucasian students at Live Oak High School ("Live Oak") wore shirts depicting the American flag to school.[1] *Dariano v. Morgan Hill Unified Sch. Dist.*, No. 11-17858, amended slip op. at 22 (9th Cir. 2014).  In the six preceding years, there had been at least thirty fights on campus, some between gangs and others between Caucasians and Hispanics, *id.* at 21, although the district court made no findings as to whether these fights were

---

[1] Like the panel, I use the ethnic and racial terminology employed by the district court, referring, for instance, to students of Mexican origin—whether born in the United States or in Mexico—as "Mexican."

related to ethnic tensions, *Dariano v. Morgan Hill Unified Sch. Dist.*, 822 F. Supp. 2d 1037, 1043 (N.D. Cal. 2011). A year earlier, during Cinco de Mayo 2009, a group of Caucasian students and a group of Mexican students exchanged profanities and threats. *Dariano*, amended slip op. at 21. When the Caucasian students hung a makeshift American flag and began chanting "U–S–A," Assistant Principal Miguel Rodriguez intervened and asked the Mexican students to stop using profane language, to which one Mexican student responded, "But Rodriguez, they are racist. They are being racist. F*** them white boys. Let's f*** them up." *Id.*

One year later, during Cinco de Mayo 2010, three of the students wearing American flag shirts were confronted by other students about their choice of apparel. *Id.* at 22. One student asked M.D., a plaintiff in this case, "Why are you wearing that? Do you not like Mexicans[?]" *Id.* A Caucasian student later told Assistant Principal Rodriguez before brunch break, "You may want to go out to the quad area. There might be some—there might be some issues." *Id.* During the break, a Mexican student informed Rodriguez that she was concerned "there might be problems" due to the American flag shirts. *Id.* Another asked Rodriguez why Caucasian students "get to wear their flag out when we don't get to wear our flag?" *Id.* (alterations omitted). Principal Nick Boden instructed Rodriguez to have the students wearing the American flag shirts turn their shirts inside out or take them off. *Id.*

Rodriguez met with the students wearing the shirts, who did not dispute that they were at risk of violence due to their apparel. *Id.* The school officials allowed two students to return to class with their American flag shirts on because

their shirts had less prominent imagery and were less likely to cause an incident. *Id.* at 23. Two other students were given the choice to turn their shirts inside out or to go home. *Id*. They chose to go home. *Id.* All plaintiffs in this appeal received threatening messages in the days after the incident. *Id.*

The students, through their guardians, brought this § 1983 action alleging violations of their First and Fourteenth Amendment rights. *Id*. at 23–24.

## II

In *Tinker v. Des Moines Independent Community School District*, a group of high school students was suspended for wearing black armbands as a way of protesting the Vietnam War. 393 U.S. 503, 504 (1969). In what has become a classic statement of First Amendment law, the Supreme Court declared, "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. Of course, as the Court has subsequently made clear, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Nonetheless, *Tinker* established that, "where students in the exercise of First Amendment rights collide with the rules of the school authorities," *Tinker*, 393 U.S. at 507, students' free speech rights "may not be suppressed unless school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (quoting *Tinker*, 393 U.S. at 513).

Invoking *Tinker*, the panel holds that the school acted properly to prevent a substantial and material disruption of school activities. *Dariano*, amended slip op. at 26–28, 33. In the panel's view, school officials acted reasonably given the history of ethnic violence at the school, the 2009 Cinco de Mayo incident, and the indications of possible violence on the day in question. *Id.* at 28. Because the officials tailored their actions to address the threat, the panel held that there was no violation of the students' free speech rights. *Id.* at 31. The panel also granted summary judgment with regard to the students' equal protection and due process claims. *Id.* at 32–35.

III

With respect, I suggest that the panel's opinion misinterprets *Tinker*'s own language, our precedent, and the law of our sister circuits. The panel claims that the *source* of the threatened violence at Live Oak is irrelevant: apparently requiring school officials to stop the source of a threat is too burdensome when a more "readily-available" solution is at hand, *id.* at 28, namely, silencing the target of the threat. Thus the panel finds it of no consequence that the students exercising their free speech rights did so peacefully, that their expression took the passive form of wearing shirts, or that there is no allegation that they threatened other students with violence.[2]      The panel condones the suppression of the

---

[2] The district court stated that the following facts are "undisputed": "no classes were delayed or interrupted by Plaintiffs' attire, no incidents of violence occurred on campus that day, and prior to asking Plaintiffs to change Defendant Rodriguez had heard no reports of actual disturbances being caused in relation to Plaintiffs' apparel." *Dariano*, 822 F. Supp. 2d at 1045.

students' speech for one reason: other students might have reacted violently against them.  Such a rationale contravenes fundamental First Amendment principles.

## A

The panel claims to be guided by the language of *Tinker*, *Dariano*, amended slip op. at 28, but in fact the panel ignores such language.  Indeed *Tinker* counseled directly against the outcome here: relying on the earlier heckler's veto case of *Terminiello v. Chicago*, 337 U.S. 1 (1949), the Court explained that students' speech, whether made "in class, in the lunchroom, or on the campus," cannot be silenced merely because those who disagree with it "may start an argument or cause a disturbance."  393 U.S. at 508 (citing *Terminiello*). *Tinker* made clear that the "Constitution says we must take th[e] risk" that speech may engender a violent response.  *Id*. Yet, rather than heed *Tinker*'s guidance, the panel undermines its holding, and, in the process, erodes the "hazardous freedom" and "openness" that "is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society."  *Tinker*, 393 U.S. at 508–09.

What the panel fails to recognize, and what we have previously held, is that *Tinker* went out of its way to reaffirm the heckler's veto doctrine; the principle that "the government cannot silence messages simply because they cause discomfort, fear, or even anger."  *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty.*, 533 F.3d 780, 788 (9th Cir. 2008) (citing *Tinker*, 393 U.S. at 508).  Quoting *Tinker*, we have explained:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . .

*Bio-Ethical Reform*, 533 F.3d at 788 (quoting *Tinker*, 393 U.S. at 508).[3] Our precedents take the position, then, that far from abandoning the heckler's veto doctrine in public schools, *Tinker* stands as a dramatic reaffirmation of it.[4]

---

[3] *Bio-Ethical Reform* was not a school case, but this is irrelevant. What *is* relevant is that in *Bio-Ethical Reform* we correctly held that *Tinker*, which *is* a school case, applied the heckler's veto doctrine. *Bio-Ethical Reform*, in other words, makes clear that the heckler's veto doctrine applies in public schools, as it did in *Tinker*.

[4] We also recognized the importance of the heckler's veto doctrine to *Tinker*'s analysis in *Jones v. Board of Regents of University of Arizona*, 436 F.2d 618 (9th Cir. 1970). The plaintiff had been ordered by campus police to cease distributing handbills on university grounds, in part due to "the fact that two members of the crowd were moved to tear the sandwich boards from Jones' body" and that "certain unidentified members of the community had threatened to remove him from the campus." *Id.* at 621. Citing *Tinker* for the heckler's veto doctrine, we said:

> Jones was lawfully and nonviolently exercising rights guaranteed to him by the Constitution of the United States . . . . [I]n this case, the action of the police was misdirected. It should have been exerted so as to

Given the central importance of the doctrine to First Amendment jurisprudence, that should come as no surprise.[5]

B

The heckler's veto doctrine is one of the oldest and most venerable in First Amendment jurisprudence. *See Terminiello v. City of Chicago*, 337 U.S. 1, 5 (1949). Indeed, the Court has gone far to protect speech where it might incur a hostile and even violent reaction from an audience. In *Street v. New York*, for example, a man was convicted for "publicly defy[ing] . . . or cast[ing] contempt upon (any American flag) by words." 394 U.S. 576, 590 (1969). The Court invalidated the conviction, rejecting the state's justification that the man's speech had a "tendency . . . to

> prevent the infringement of Jones' constitutional right by those bent on stifling, even by violence, the peaceful expression of ideas or views with which they disagreed.

*Id.* Those wise principles are just as applicable in the context of this case.

[5] None of the precedents cited by the panel are to the contrary. In *Wynar v. Douglas County School District*, it was *the speaker* who "threatened the student body as a whole and targeted specific students by name," and we held that the school was justified in punishing the student for engaging in speech of that nature. 728 F.3d 1062, 1070–72 (9th Cir. 2013). The same was true in *LaVine v. Blaine School District*, where we stated that the speech in question indicated that the student "was intending to inflict injury upon himself or others," 257 F.3d 981, 990 (9th Cir. 2001). Although *Karp v. Becken* mentions concerns about "the provocation of an incident, including possible violence," the conduct and speech *of the speaker* was itself disruptive. *See* 477 F.2d 171, 173, 176 (9th Cir. 1973) (describing the speaker as attempting to lead a "chant" and walk-out while also bringing news media to campus "to publicize [his] demonstration"). None of these cases stand for the proposition that peaceful, passive expression can be suppressed based on the reactions of *other students*.

provoke violent retaliation." *Id.* at 592. The heckler's veto doctrine also protected a civil rights leader's peaceful speech during a lunch counter sit-in protest, despite the state's alleged fear that "'violence was about to erupt' because of the demonstration." *Cox v. Louisiana*, 379 U.S. 536, 550 (1965). As the Court said in *Cox*, "[T]he compelling answer . . . is that constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Id.* at 551 (internal quotation marks omitted).

Of course, this doctrine does not apply to all categories of speech. The Court has recognized that there are "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942); *see also United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) (listing types of speech that are not part of "the freedom of speech"). Where, for instance, speech constitutes "'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace," *Chaplinsky*, 315 U.S. at 572; is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); or is a "true threat," *Virginia v. Black*, 538 U.S. 343, 358–60 (2003), such speech may be prohibited, subject to certain limitations, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–86 (1992). But apart from these well-recognized categories, "the government may not give weight to the audience's negative reaction" as a basis for suppressing speech. *Ctr. for Bio-Ethical Reform, Inc.*, 533 F.3d at 789; *see also Texas v. Johnson*, 491 U.S. 397, 408–09 (1989) ("[A] principal function of free speech under our system of

government is to invite dispute.") (internal quotation marks omitted) (quoting *Terminiello*) (citing *Tinker*).

## C

Despite *Tinker*'s emphasis on the actions of the speaker and its reaffirmation of the heckler's veto doctrine, the panel ignores these foundational precepts of First Amendment jurisprudence and condones using the heckler's veto as a basis for suppressing student speech.

The established First Amendment principles that the panel disregards exist for good reason. Rather than acting to protect the students who were peacefully expressing their views, Live Oak decided to suppress the speech of those students because *other students* might do them harm. Live Oak's reaction to the possible violence against the student speakers, and the panel's blessing of that reaction, sends a clear message to public school students: by threatening violence against those with whom you disagree, you can enlist the power of the State to silence them. This perverse incentive created by the panel's opinion is precisely what the heckler's veto doctrine seeks to avoid.

In this case, the disfavored speech was the display of an American flag. But let no one be fooled: by interpreting *Tinker* to permit the heckler's veto, the panel opens the door to the suppression of any viewpoint opposed by a vocal and violent band of students. The next case might be a student wearing a shirt bearing the image of Che Guevara, or Martin Luther King, Jr., or Pope Francis. It might be a student wearing a President Obama "Hope" shirt, or a shirt exclaiming "Stand with Rand!" It might be a shirt proclaiming the *shahada*, or a shirt announcing "Christ is

risen!" It might be any viewpoint imaginable, but whatever it is, it will be vulnerable to the rule of the mob. The demands of bullies will become school policy.

That is not the law.

## IV

The Seventh and Eleventh Circuits agree that a student's speech cannot be suppressed based on the violent reaction of its audience. Thus the panel is simply wrong that our sister circuits' cases "do not distinguish between 'substantial disruption' caused by the speaker and 'substantial disruption' caused by the reaction of onlookers." *Dariano*, amended slip op. at 29. In *Zamecnik v. Indian Prairie School District No. 204*, a student wore a t-shirt to school on the Day of Silence bearing the slogan, "Be Happy, Not Gay." 636 F.3d 874, 875 (7th Cir. 2011). The school sought to prohibit the student from wearing the shirt based, in part, on "incidents of harassment of plaintiff Zamecnik." *Id.* at 879. The Seventh Circuit squarely rejected that rationale as "barred by the doctrine . . . of the 'heckler's veto.'" *Id. Zamecnik* made clear that *Tinker* "endorse[s] the doctrine of the heckler's veto" and described the rationale behind that doctrine:

> Statements that while not fighting words are met by violence or threats or other unprivileged retaliatory conduct by persons offended by them cannot lawfully be suppressed because of that conduct. Otherwise free speech could be stifled by the speaker's opponents' mounting a riot, even though, because the speech had contained no fighting words, no reasonable person would

> have been moved to a riotous response. So
> the fact that homosexual students and their
> sympathizers harassed Zamecnik because of
> their disapproval of her message is not a
> permissible ground for banning it.

*Id.* The court affirmed the grant of summary judgment to
Zamecnik. *Id.* at 882.

The Eleventh Circuit is of the same opinion. In *Holloman
ex rel. Holloman v. Harland*, a school punished a student for
silently holding up a fist rather than reciting the Pledge of
Allegiance. 370 F.3d 1252, 1259 (11th Cir. 2004). School
officials justified their actions, in part, by citing "concern that
[the student's] behavior would lead to further disruptions by
other students." *Id.* at 1274. The Eleventh Circuit
acknowledged that *Tinker* governed its analysis, and in an
impassioned paragraph, the court invoked the heckler's veto
doctrine:

> Allowing a school to curtail a student's
> freedom of expression based on such factors
> turns reason on its head. If certain bullies are
> likely to act violently when a student wears
> long hair, it is unquestionably easy for a
> principal to preclude the outburst by
> preventing the student from wearing long hair.
> To do so, however, is to sacrifice freedom
> upon the alter [*sic*] of order, and allow the
> scope of our liberty to be dictated by the
> inclinations of the unlawful mob.

*Id.* at 1275. Particularly relevant here, the Eleventh Circuit squarely rejected the claim that the heckler's veto doctrine does not apply in public schools:

> While the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason. If the people, acting through a legislative assembly, may not proscribe certain speech, neither may they do so acting individually as criminals. Principals have the duty to maintain order in public schools, but they may not do so while turning a blind eye to basic notions of right and wrong.

*Id*. at 1276. The court reversed the district court's grant of summary judgment to the school and reinstated Holloman's claims. *Id.* at 1294–95.

The panel's holding, then, represents a dramatic departure from the views of our sister circuits.[6] Yet, one would never

---

[6] Unable to distinguish *Zamecnik* or *Holloman* convincingly, the panel looks for support from *Taylor v. Roswell Independent School District*, 713 F.3d 25 (10th Cir. 2013). But *Taylor* offers no support for its view. *Taylor* did not involve a heckler's veto, and, in fact, the Tenth Circuit implied that the heckler's veto doctrine would have applied if the facts had implicated it. This is revealed in a footnote, quoted only in part by the panel. *Dariano*, amended slip op. at 29 (quoting *Taylor*, 713 F.3d at 38 n.11). In the footnote's omitted conclusion, the Tenth Circuit observes:

know it from reading the panel's opinion, since the contrary decisions of those circuits are barely mentioned and completely mis-characterized.

V

Finally, the panel attempts to analogize this case to those involving school restrictions on Confederate flags. *See Dariano*, amended slip op. at 30–31. But these cases, dealing solely with a symbol that is "widely regarded as racist and incendiary," *Zamecnik*, 636 F.3d at 877, cannot override *Tinker* here.[7]

The panel takes the Confederate flag cases to be a single "illustrat[ion]" of the much broader "principle" that the heckler's veto doctrine does not apply to schools. *Dariano*, amended slip op. at 30. But as that broad "principle" is incorrect, the Confederate flag cases cannot illustrate it.

---

> Moreover, there is no indication *in this case* that the problematic student disruptions *were aimed at stopping plaintiffs' expression*, and plaintiffs did not otherwise develop such an argument.

713 F.3d at 38 n.11. (emphasis added). Thus, contrary to what the panel implies, the speech restriction in *Taylor* was permissible *not* because the heckler's veto doctrine was inapplicable to Roswell public schools, but because *Taylor*'s facts simply did not involve a heckler's veto.

[7] In fact the Eleventh Circuit has suggested that displays of the Confederate flag may not even be deserving of the full protection of *Tinker*, but rather are offensive under the standard of *Bethel School District v. Fraser*, 478 U.S. 675 (1986). *See Scott v. School Bd. Of Alachua Cty.*, 324 F.3d 1246, 1248 (11th Cir. 2003) (per curiam); *Denno v. Sch. Bd. Of Volusia Cty., Fla.*, 218 F.3d 1267, 1273–74 (11th Cir. 2000).

Indeed, what the cases actually illustrate is a permissive attitude towards regulation of the Confederate flag that is based on the flag's unique and racially divisive history.**[8]** Whether or not this history provides a principled basis for the regulation of Confederate icons, it certainly provides no support for banning displays of the American flag.

---

**[8]** The Confederate flag cases cited by the panel all emphasize that, across America, Confederate symbols carry an inherently divisive message. *See, e.g.*, *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 436 (4th Cir 2013) (describing the flag as a "symbol of racial separation and oppression"); *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 223 (5th Cir. 2009) (justifying regulation in part on "the racially inflammatory meaning associated with the Confederate flag"); *Barr v. Lafon*, 538 F.3d 554, 570 (6th Cir. 2008) (describing the perception that Confederate icons celebrate "white supremacy"); *B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 742 (9th Cir. 2009) (explaining that some view the Confederate flag "as a statement of racism"); *West v. Derby Unified Sch. Dist. No. 260*, 23 F.Supp.2d 1223, 1233 (D. Kan. 1998) (describing the Confederate flag as representing "[t]o many" an "expression of continuing contempt for the rights of African-Americans"), *aff'd*, 206 F.3d 1358 (10th Cir. 2000) (adopting the reasoning of the district court); *Scott v. Sch. Bd of Alachua Cnty.*, 324 F.3d 1246, 1249 (11th Cir. 2003) (per curiam) (finding it "correct" to assert that the Confederate flag represents "approval of white supremacy" and "has acquired numerous racist associations to the point that the flag itself has understandably come to be perceived as a racist symbol").

Indeed, in another case upholding a ban on Confederate flags in schools, the Sixth Circuit supported its decision with the observation that several federal appellate courts have commented "on the Confederate flag's *inherent* racial divisiveness." *D.B. ex rel. Brogdon v. Lafon*, 217 Fed.Appx. 518, 523–24 (6th Cir. 2007) (emphasis added) (citing *NAACP v. Hunt*, 891 F.2d 1555, 1564 (11th Cir. 1990); *Briggs v. State of Mississippi*, 331 F.3d 499, 506 (5th Cir. 2003), cert. denied, 540 U.S. 1108 (2004); *Castorina ex rel. Rewt v. Madison County Sch. Bd.*, 246 F.3d 536, 540 (6th Cir. 2001)).

VI

The panel's opinion contravenes foundational First Amendment principles, creates a split with the Seventh and Eleventh Circuits, and imperils minority viewpoints of all kinds.  Like our sister circuits, I would hold that the reaction of other students to the student speaker is not a legitimate basis for suppressing student speech absent a showing that the speech in question constitutes fighting words, a true threat, incitement to imminent lawless action, or other speech outside the First Amendment's protection.  *See Zamecnik*, 636 F.3d at 879 (rejecting the heckler's veto "because the speech had contained no fighting words"); *Holloman*, 370 F.3d at 1275–76 (citing *Street* for the proposition that "the possible tendency of appellant's words to provoke violent retaliation is not a basis for banning those words unless they are 'fighting words'" (internal quotation marks omitted)).

I respectfully dissent from our regrettable decision not to rehear this case en banc.

**OPINION**

McKEOWN, Circuit Judge:

We are asked again to consider the delicate relationship between students' First Amendment rights and the operational and safety needs of schools. As we noted in *Wynar v. Douglas County School District*, 728 F.3d 1062, 1064 (9th Cir. 2013), "school administrators face the daunting task of evaluating potential threats of violence and keeping

their students safe without impinging on their constitutional rights." In this case, after school officials learned of threats of race-related violence during a school-sanctioned celebration of Cinco de Mayo, the school asked a group of students to remove clothing bearing images of the American flag.[1]

The students brought a civil rights suit against the school district and two school officials, alleging violations of their federal and state constitutional rights to freedom of expression, equal protection, and due process. We affirm the district court's grant of summary judgment as to the only defendant party to this appeal, Assistant Principal Miguel Rodriguez, and its denial of the students' motion for summary judgment, on all claims. School officials anticipated violence or substantial disruption of or material interference with school activities, and their response was tailored to the circumstances. As a consequence, we conclude that school officials did not violate the students' rights to freedom of expression, due process, or equal protection.

## BACKGROUND

This case arose out of the events of May 5, 2010, Cinco de Mayo, at Live Oak High School ("Live Oak" or "the School"), part of the Morgan Hill Unified School District in Northern California. The Cinco de Mayo celebration was presented in the "spirit of cultural appreciation." It was described as honoring "the pride and community strength of the Mexican people who settled this valley and who continue to work here." The school likened it to St. Patrick's Day or Oktoberfest. The material facts are not in dispute.

---

[1] Because the students' names are confidential, we refer to them collectively as "the students," or by their initials, M.D., D.G., and D.M.

Live Oak had a history of violence among students, some gang-related and some drawn along racial lines. In the six years that Nick Boden served as principal, he observed at least thirty fights on campus, both between gangs and between Caucasian and Hispanic students. A police officer is stationed on campus every day to ensure safety on school grounds.

On Cinco de Mayo in 2009, a year before the events relevant to this appeal, there was an altercation on campus between a group of predominantly Caucasian students and a group of Mexican students.[2] The groups exchanged profanities and threats. Some students hung a makeshift American flag on one of the trees on campus, and as they did, the group of Caucasian students began clapping and chanting "USA." A group of Mexican students had been walking around with the Mexican flag, and in response to the white students' flag-raising, one Mexican student shouted "f*** them white boys, f*** them white boys." When Assistant Principal Miguel Rodriguez told the student to stop using profane language, the student said, "But Rodriguez, they are racist. They are being racist. F*** them white boys. Let's f*** them up." Rodriguez removed the student from the area.

At least one party to this appeal, student M.D., wore American flag clothing to school on Cinco de Mayo 2009. M.D. was approached by a male student who, in the words of

---

[2] We use the ethnic and racial terminology employed by the district court (Caucasian, Hispanic, Mexican). For example, the district court at times referred to students of Mexican origin born in the United States and students born in Mexico collectively as "Mexican." We adopt the same practice here, for the limited purpose of clarifying the narrative.

the district court, "shoved a Mexican flag at him and said something in Spanish expressing anger at [M.D.'s] clothing."

A year later, on Cinco de Mayo 2010, a group of Caucasian students, including the students bringing this appeal, wore American flag shirts to school. A female student approached M.D. that morning, motioned to his shirt, and asked, "Why are you wearing that? Do you not like Mexicans[?]" D.G. and D.M. were also confronted about their clothing before "brunch break."

As Rodriguez was leaving his office before brunch break, a Caucasian student approached him, and said, "You may want to go out to the quad area. There might be some—there might be some issues." During the break, another student called Rodriguez over to a group of Mexican students, said that she was concerned about a group of students wearing the American flag, and said that "there might be problems." Rodriguez understood her to mean that there might be a physical altercation. A group of Mexican students asked Rodriguez why the Caucasian students "get to wear their flag out when we [sic] don't get to wear our [sic] flag?"

Boden directed Rodriguez to have the students either turn their shirts inside out or take them off. The students refused to do so.

Rodriguez met with the students and explained that he was concerned for their safety. The students did not dispute that their attire put them at risk of violence. Plaintiff D.M. said that he was "willing to take on that responsibility" in order to continue wearing his shirt. Two of the students, M.D. and D.G., said they would have worn the flag clothing even if they had known violence would be directed toward them.

School officials permitted M.D. and another student not a party to this action to return to class, because Boden considered their shirts, whose imagery was less "prominent," to be "less likely [to get them] singled out, targeted for any possible recrimination," and "significant[ly] differen[t] in [terms of] what [he] saw as being potential for targeting."[3]

The officials offered the remaining students the choice either to turn their shirts inside out or to go home for the day with excused absences that would not count against their attendance records. Students D.M. and D.G. chose to go home. Neither was disciplined.

In the aftermath of the students' departure from school, they received numerous threats from other students. D.G. was threatened by text message on May 6, and the same afternoon, received a threatening phone call from a caller saying he was outside of D.G.'s home. D.M. and M.D. were likewise threatened with violence, and a student at Live Oak overheard a group of classmates saying that some gang members would come down from San Jose to "take care of" the students. Because of these threats, the students did not go to school on May 7.

The students and their parents, acting as guardians, brought suit under 42 U.S.C. § 1983 and the California Constitution against Morgan Hill Unified School District ("the District"); and Boden and Rodriguez, in their official and individual capacities, alleging violations of their federal and California constitutional rights to freedom of expression

---

[3] The students permitted to return to class were wearing "Tap Out" (or "TapouT") shirts, which bear the logo of a popular martial arts company, sometimes (as here) with flag iconography.

and their federal constitutional rights to equal protection and due process.

On cross-motions for summary judgment, the district court granted Rodriguez's motion on all claims and denied the students' motion on all claims, holding that school officials did not violate the students' federal or state constitutional rights. The district court did not address claims against Boden, because he was granted an automatic stay in bankruptcy. The district court dismissed all claims against the District on grounds of sovereign immunity, a ruling not challenged on appeal. The question on appeal is thus whether Rodriguez, in his official or individual capacity, violated the students' constitutional rights.

## ANALYSIS

## I.  FIRST AMENDMENT CLAIMS

We analyze the students' claims[4] under the well-recognized framework of *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).[5] Under

---

[4] Because California follows federal law for free expression claims arising in the school setting, the students' federal and state claims stand or fall together. *Cal. Teachers Ass'n v. Governing Bd. of San Diego Unified Sch. Dist.*, 45 Cal. App. 4th 1383, 1391–92  (1996).

[5] As we noted in *Wynar*, 728 F.3d at 1067, student speech that is "vulgar, lewd, obscene [or] plainly offensive" is governed by *Bethel School District Number 403 v. Fraser*, 478 U.S. 675 (1986); speech that is "school-sponsored" is governed by *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988); and speech that "falls into neither of these categories" is governed by *Tinker*. *See Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992) (listing standards).

*Tinker*, students may "express [their] opinions, even on controversial subjects . . . if [they] do[] so without materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others." *Id.* at 513 (final alteration in original) (internal quotation marks omitted). To "justify prohibition of a particular expression of opinion," school officials "must be able to show that [their] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509.

That said, "conduct by the student, in class or out of it, which for any reason— whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513. Under *Tinker*, schools may prohibit speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities," or that constitutes an "actual or nascent [interference] with the schools' work or . . . collision with the rights of other students to be secure and to be let alone." *Id.* at 508, 514; *see also Wynar*, 728 F.3d at 1067 (quoting *Tinker*, 393 U.S. at 508, 514.). As we have explained, "the First Amendment does not require school officials to wait until disruption actually occurs before they may act. In fact, they have a duty to prevent the occurrence of disturbances." *Karp v. Becken*, 477 F.2d 171, 175 (9th Cir. 1973) (footnote omitted). Indeed, in the school context, "the level of disturbance required to justify official intervention is relatively lower in a public school than it might be on a street corner." *Id.*   As the Seventh Circuit explained, "[s]chool authorities are entitled to exercise discretion in determining

when student speech crosses the line between hurt feelings and substantial disruption of the educational mission." *Zamecnik v. Indian Prairie Sch. Dist. #204*, 636 F.3d 874, 877–78 (7th Cir. 2011).

Although *Tinker* guides our analysis, the facts of this case distinguish it sharply from *Tinker*, in which students' "pure speech" was held to be constitutionally protected. 393 U.S. at 508. In contrast to *Tinker*, in which there was "no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone," *id.*, there was evidence of nascent and escalating violence at Live Oak. On the morning of May 5, 2010, each of the three students was confronted about their clothing by other students, one of whom approached student M.D. and asked, "Why are you wearing that? Do you not like Mexicans[?]" Before the brunch break, Rodriguez learned of the threat of a physical altercation. During the break, Rodriguez was warned about impending violence by a second student. The warnings of violence came, as the district court noted, "in [the] context of ongoing racial tension and gang violence within the school, and after a near-violent altercation had erupted during the prior Cinco de Mayo over the display of an American flag." Threats issued in the aftermath of the incident were so real that the parents of the students involved in this suit kept them home from school two days later.

The minimal restrictions on the students were not conceived of as an "urgent wish to avoid the controversy," as in *Tinker*, *id.* at 510, or as a trumped-up excuse to tamp down student expression. The controversy and tension remained, but the school's actions presciently avoided an altercation. Unlike in *Tinker*, where "[e]ven an official memorandum

prepared after the [students'] suspension that listed the reasons for the ban on wearing the armbands made no reference to the anticipation of such disruption," *id.* at 509, school officials here explicitly referenced anticipated disruption, violence, and concerns about student safety in conversations with students at the time of the events, in conversations the same day with the students and their parents, and in a memorandum and press release circulated the next day.

In keeping with our precedent, school officials' actions were tailored to avert violence and focused on student safety, in at least two ways. For one, officials restricted the wearing of certain clothing, but did not punish the students. School officials have greater constitutional latitude to suppress student speech than to punish it. In *Karp*, we held that school officials could "curtail the exercise of First Amendment rights when they c[ould] reasonably forecast material interference or substantial disruption," but could not discipline the student without "show[ing] justification for their action." 477 F.2d at 176; *cf. Wynar*, 728 F.3d at 1072 (upholding expulsion, despite its "more punitive character," as a justified response to threats); *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 992 (9th Cir. 2001).

For another, officials did not enforce a blanket ban on American flag apparel, but instead allowed two students to return to class when it became clear that their shirts were unlikely to make them targets of violence. The school distinguished among the students based on the perceived threat level, and did not embargo all flag-related clothing. *See* Background, *supra.*

Finally, whereas the conduct in *Tinker* expressly did "not concern aggressive, disruptive action or even group demonstrations," 393 U.S. at 508, school officials at Live Oak reasonably could have understood the students' actions as falling into any of those three categories, particularly in the context of the 2009 altercation. The events of 2010 took place in the shadow of similar disruptions a year earlier, and pitted racial or ethnic groups against each other. Moreover, students warned officials that there might be physical fighting at the break.[6]

We recognize that, in certain contexts, limiting speech because of reactions to the speech may give rise to concerns about a "heckler's veto."[7] But the language of *Tinker* and the school setting guides us here. Where speech "for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others," school officials may limit the speech. *Tinker*, 393 U.S. at 513. To require school officials to precisely identify the source of a violent threat before taking readily-available steps to quell the threat would burden officials' ability to protect the students in their charge—a particularly salient concern in an era of rampant school violence, much of it involving guns, other weapons, or

---

[6] Our recent case of *Frudden v. Pilling*, 742 F.3d 1199 (9th Cir. 2014), is not instructive here, since that case, unlike this one, involved compelled speech in the form of a mandatory uniform policy and did not involve the intersection of the First Amendment and violence or a threat of violence in the school setting. *Id. at* 1204.

[7] The term "heckler's veto" is used to describe situations in which the government stifles speech because it is "offensive to some of [its] hearers, or simply because bystanders object to peaceful and orderly demonstrations." *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) (internal citations and quotation marks omitted).

threats on the internet—and run counter to the longstanding directive that there is a distinction between "threats or acts of violence on school premises" and speech that engenders no "substantial disruption of or material interference with school activities." *Id.* at 508, 514; *see also id.* at 509, 513.

In the school context, the crucial distinction is the nature of the speech, not the source of it. The cases do not distinguish between "substantial disruption" caused by the speaker and "substantial disruption" caused by the reactions of onlookers or a combination of circumstances. *See, e.g.*, *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 38, 38 n. 11 (10th Cir. 2013) (observing that "Plaintiffs note that most disruptions occurred only because of wrongful behavior of third parties and that no Plaintiffs participated in these activities . . . . This argument might be effective outside the school context, but it ignores the 'special characteristics of the school environment,'" and that the court "ha[d] not found[] case law holding that school officials' ability to limit disruptive expression depends on the blameworthiness of the speaker. To the contrary, the *Tinker* rule is guided by a school's need to protect its learning environment and its students, and courts generally inquire only whether the potential for substantial disruption is genuine." (quoting *Tinker*, 393 U.S. at 506)); *Zamecnik*, 636 F.3d at 879–80 (looking to the reactions of onlookers to determine whether the speech could be regulated); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1272 (11th Cir. 2004) (looking to the reactions of onlookers to determine whether a student's expression "cause[d] (or [was] likely to cause) a material and substantial disruption") (alterations and internal quotation marks omitted).

Perhaps no cases illustrate this principle more clearly than those involving displays of the Confederate flag in the school context. We respect the American flag, and know that its meaning and its history differ greatly from that of the Confederate flag. Nevertheless, the legal principle that emerges from the Confederate flag cases is that what matters is substantial disruption or a reasonable forecast of substantial disruption, taking into account either the behavior of a speaker—*e.g.*, causing substantial disruption alongside the silent or passive wearing of an emblem—or the reactions of onlookers. Not surprisingly, these cases also arose from efforts to stem racial tension that was disruptive. Like *Dariano*, the reasoning in these cases is founded on *Tinker*. *See, e.g.*, *Hardwick*, 711 F.3d at 437 (Fourth Circuit case upholding school officials' ban on shirts with labels like "Southern Chicks," "Dixie Angels," and "Daddy's Little Redneck," and the Confederate flag icon, even though the bearer contended that hers was a "silent, peaceable display" that "even drew positive remarks from some students" and "never caused a disruption" because "school officials could reasonably forecast a disruption because of her shirts" (internal quotation marks omitted)); *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 223 (5th Cir. 2009) (noting that "[o]ther circuits, applying *Tinker*, have held that administrators may prohibit the display of the Confederate flag in light of racial hostility and tension at their schools"); *Barr v. Lafon*, 538 F.3d 554, 567–68 (6th Cir. 2008) (noting the "disruptive potential of the flag in a school where racial tension is high," and that "[o]ur holding that the school in the circumstances of this case reasonably forecast the disruptive effect of the

Confederate flag accords with precedent in our circuit as well as our sister circuits").[8]

Our role is not to second-guess the decision to have a Cinco de Mayo celebration or the precautions put in place to avoid violence where the school reasonably forecast substantial disruption or violence. "We review . . . with deference[] schools' decisions in connection with the safety of their students even when freedom of expression is involved," keeping in mind that "deference does not mean abdication." *LaVine*, 257 F.3d at 988, 992. As in *Wynar*, the question here is not whether the threat of violence was real, but only whether it was "reasonable for [the school] to proceed as though [it were]." 728 F.3d at 1071; *Karp*, 477 F.2d at 175 (noting that "*Tinker* does not demand a certainty that disruption will occur, but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption"). Here, both the specific events of May 5, 2010, and the pattern of which those events were a part made it reasonable for school officials to proceed as though the threat of a potentially violent disturbance was real. We hold that school officials, namely Rodriguez, did not act unconstitutionally, under either the First Amendment or Article I, § 2(a) of the California Constitution,  in asking students to turn their shirts inside out, remove them, or leave school for the day with an excused absence in order to prevent substantial disruption or violence at school.

---

[8] Other circuits that have considered the question have adopted the same logic. *See, e.g.*,  *B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 739–40 (8th Cir. 2009); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1365–66 (10th Cir. 2000); *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1248 (11th Cir. 2003) (per curiam).

## II.  EQUAL PROTECTION CLAIM

The students' equal protection claim is a variation of their First Amendment challenge. *Cf.* U.S. CONST. amend. XIV, § 1 (stating that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws"). They allege that they were treated differently than students wearing the colors of the Mexican flag, and that their speech was suppressed because their viewpoint was disfavored. We note that the students had no response when asked why they chose to wear flag clothing on the day in question. The school responds that it had a viewpoint-neutral reason—student safety—for suppressing the speech in question, and that they treated "all students for whose safety they feared in the same manner."

Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and the Equal Protection Clause. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 n.4 (1992) (noting that the Supreme Court "has occasionally fused the First Amendment into the Equal Protection Clause in this fashion, but . . . with the acknowledgment . . . that the First Amendment underlies its analysis"). Where plaintiffs allege violations of the Equal Protection Clause relating to expressive conduct, we employ "essentially the same" analysis as we would in a case alleging only content or viewpoint discrimination under the First Amendment. *Barr v. Lafon*, 538 F.3d 554, 575 (6th Cir. 2008).

In the school context, we look again to *Tinker*. 393 U.S. at 510; *see also Barr*, 538 F.3d at 576–77; *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 (5th Cir. 2004) (stating that *Tinker* "applies to school regulations directed at

specific student viewpoints"). According to *Tinker*, schools are not forced to "prohibit the wearing of all symbols of political or controversial significance" in order to justify a prohibition against the wearing of a certain symbol, if such a prohibition is "necessary to avoid material and substantial interference with schoolwork or discipline." 393 U.S. at 510–11. Schools may, under *Tinker*, ban certain images, for example images of the Confederate flag on clothing, even though such bans might constitute viewpoint discrimination. *See, e.g.*, *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1184–85 (9th Cir. 2006) (noting that "[w]hile the Confederate flag may express a particular viewpoint, '[i]t is not only constitutionally allowable for school officials' to limit the expression of racially explosive views, 'it is their duty to do so'" (alteration in original) (quoting *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1249 (11th Cir. 2003) (per curiam)), *judgment vacated on other grounds sub nom. Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007); *Scott*, 324 F.3d at 1248 (upholding district court order barring Confederate symbols based on "the potential disruption that the displaying of Confederate symbols would likely create"); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366–67 (10th Cir. 2000) (upholding ban on Confederate symbols based on a "series of racial incidents or confrontations," including "hostile confrontations between a group of white and black students").

As the district court noted, the students offered no evidence "demonstrating that students wearing the colors of the Mexican flag were targeted for violence." The students offered no evidence that students at a similar risk of danger were treated differently, and therefore no evidence of impermissible viewpoint discrimination.

Because the record demonstrates that the students' shirts "might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," *Tinker*, 393 U.S. at 514, the authorities' actions were permissible under *Tinker*. We reject the students' equal protection claim.

## III.    DUE PROCESS AND INJUNCTIVE RELIEF CLAIMS

The students further challenge the District's dress code, which prohibits clothing that "indicate[s] gang affiliation, create[s] a safety hazard, or disrupt[s] school activities." They seek to permanently enjoin the use of the dress code, claiming that it fails to provide objective standards by which to referee student attire, in violation of the Due Process Clause.[9] We reject the students' due process claims.

The Supreme Court has "recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures," and has thus specified that, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code . . . . " *Bethel Sch. Dist.*, 478 U.S. at 686 (holding that a school had not violated a student's due process rights by disciplining him for lewd speech under a policy prohibiting "obscene" speech).

---

[9] Although the District is not a party to this appeal, we consider the students' dress code claims because they brought suit against Rodriguez in his official capacity.

The District's dress code is in line with others that the federal courts have held to be permissible. *See, e.g.*, *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 441, 444 (4th Cir. 2013) (upholding code prohibiting "disrupt[ive]" or "offensive" clothing, including clothing that "distract[s]" or "interfere[s]"), *cert. denied*, 134 S. Ct. 201 (2013); *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 224 (5th Cir. 2009) (upholding code prohibiting clothing with "inappropriate symbolism").

Significantly, the dress code challenged here incorporates the standards sanctioned in *Tinker*: safety and disruption. *See B.W.A. v. Farmington R-7 Sch. Dist.*, 508 F. Supp. 2d 740, 750–51 (E.D. Mo. 2007) (holding that a dress code that contains language that "tracks *Tinker*" poses "no real danger" of compromising the First Amendment rights of students), *aff'd* 554 F.3d 734 (8th Cir. 2009); *see also Hardwick*, 711 F.3d at 441. It would be unreasonable to require a dress code to anticipate every scenario that might pose a safety risk to students or that might substantially disrupt school activities. Dress codes are not, nor should they be, a school version of the Code of Federal Regulations. It would be equally unreasonable to hold that school officials could not, at a minimum, rely upon the language *Tinker* gives them.

We affirm the district court's holding that the policy is not unconstitutionally vague and does not violate the students' right to due process.

**AFFIRMED.**